# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-0498V**

| | |
|---|---|
| OLIVIA HONN,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br><br>Filed: June 30, 2026 |

*Jessica W. Hayes, Murray Law Firm, New Orleans, LA, for Petitioner.*

*Lauren Kells, U.S. Department of Justice, Washington, DC, for Respondent.*

**RULING ON ENTITLEMENT**[1]

On January 11, 2021, Olivia Honn filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of an influenza ("flu") vaccine received on January 29, 2018, she suffered a right shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition at 1 (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters.

[1] Because this ruling and decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means this Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I determine that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner has carried her burden of proof in establishing that she suffered a Table SIRVA injury, and therefore is entitled to compensation.

## I. <u>Relevant Procedural History</u>

This claim was initiated on January 11, 2021. (ECF No. 1). On December 16, 2022, Respondent filed his Rule 4(c) Report in which he contested entitlement, contending that Petitioner had failed to show she suffered the effects of her alleged injury for more than six months. On April 16, 2025, Petitioner filed a Motion for Ruling on the Record. (ECF No. 41). Respondent filed his response brief on June 13, 2025. (ECF No. 42). Petitioner filed a Reply brief on July 29, 2025. (ECF No. 44). The matter is now ripe for disposition.

## II. <u>Relevant Medical History</u>

### A. Medical Records

On June 8, 2017 (approximately seven and a half months prior to the vaccination at issue), Petitioner saw orthopedist Kevin Watson, M.D., for complaints of left shoulder pain for the past three to four months, and bilateral knee pain when kneeling for the past two months. Ex. 2 at 9. On exam, she had stiffness and limited range of motion ("ROM") in her left shoulder and good strength. *Id.* She had some mild patellofemoral crepitus in her knee. *Id.* She was diagnosed with left frozen shoulder and chrondomalacia of the patella. *Id.* She was told her shoulder would improve with time and was given home exercises and stretches to complete. *Id.*

On January 29, 2018, Petitioner went to urgent care for evaluation of left foot pain for the past three days. Ex. 1 at 5. An x-ray of her left foot was normal. *Id.* at 9. Petitioner was instructed to rest, ice, wrap, and elevate her foot. *Id.* at 7. She was further given a walking boot, prescribed Naprosyn, and instructed to follow up with her primary care provider or orthopedist within a few days. *Id.* Petitioner was also administered a seasonal flu vaccine in her right arm at the same visit. *Id.* at 7.

Three days later, on February 1, 2018, Petitioner returned to Dr. Watson. Ex. 2 at 7. Petitioner reported that she was still having problems with her left frozen shoulder and left foot. *Id.* She also reported new-onset pain and limited ROM in her right shoulder after her vaccination. *Id.* On examination, Petitioner displayed left foot swelling and pain with ROM in her right arm. *Id.* X-rays of her right shoulder apparently showed "type 1 and 2 acromion." *Id.* The assessment was right shoulder inflammation. Dr. Watson administered a cortisone injection and referred Petitioner to physical therapy ("PT"). *Id.*, *see also* Ex. 2 at 10.

Petitioner visited Performance Physical Therapy for pain and decreased ROM in both shoulders on February 7, 2018. Ex. 3 at 4. At her initial evaluation, Petitioner reported receiving a flu vaccine in her right shoulder that was administered "too superior and caused immediate right shoulder pain," and that the cortisone injection administered at her orthopedic visit did not provide relief. *Id.* at 5. She reported difficulty with working with her arms during the day, pushing herself up from a chair, sleeping, and completing some activities of daily living ("ADLs") with her five-year-old son. *Id.* On examination, she had pain and decreased ROM in both shoulders. *Id.* The plan was for Petitioner to participate in PT to assist with "thawing" of her left shoulder adhesive capsulitis, and for right shoulder tendinitis and impingement. *Id.*

Petitioner attended 20 sessions of PT for treatment of both shoulders before her discharge on May 16, 2018. Ex. 3 at 6-10. On March 7, 2018, it was noted that she revealed improvements in her left arm, but continued to have pain in her vaccinated right arm. *Id.* at 7. Her therapist wrote that the plan was to avoid Petitioner developing a right-sided frozen shoulder following the resolution of her left-sided frozen shoulder. *Id.* On March 9, 2018, the PT therapist noted that they reviewed possible aggravating behaviors, including reaching behind her for the seatbelt in the car, sleeping with her arms above her head, and a reminder to push and not pull her trash cans. *Id.* at 10. Petitioner was discharged to a home exercise program ("HEP") on May 16, 2018, and it was noted that she had met her PT goals. *Id.* at 10.

On March 22, 2018, Petitioner saw her oncological surgeon, Pui Chun Chen, M.D., for a routine follow up of her ovarian cancer. Ex. 5-1 at 106-07. Dr. Cheng noted that the only new medical issue was a "shoulder injury due to a flu shot that was given to her at urgent care." *Id.* at 106. He further wrote that she had been attending PT and her shoulder was "much improved." *Id.* He also noted that petitioner was working as a home healthcare nurse but planned to begin work as a travel nurse in the fall. *Id.*

Petitioner did not seek care for her right shoulder again for nearly a year, or until April 18, 2019. Ex. 2 at 10. Petitioner has filed an affidavit attempting to explain the delay, contending therein that during this period she was traveling with her family and working as a travel nurse. Ex. 9 at 2-3, ¶¶ 8-13. Petitioner further states that she was without health insurance from May 2019 through March 2019. *Id.* at 3, ¶ 15. However, Petitioner sought medical care for other issues during this time. *See* Ex. 4-2 at 356-66 (cancer-related lab work completed on July 26, 2018); Ex. 5-3 at 1088-94 (follow up visit with Dr. Chang for ovarian cancer and headaches on August 1, 2018); Ex. 5-3 at 1108, 1118-19 (brain MRI and referral to neurology to evaluate petitioner's headaches on August 8, 2018); Ex. 5-3 at 1016-17 (surgical consult for port removal on October 4, 2018); Ex. 4-2

at 301-24 (preoperative screening for port removal on October 12, 2018); Ex. 4-1 at 189 (port removal procedure on October 1, 2018).

On April 18, 2019, Petitioner returned to Dr. Watson for further evaluation of her right shoulder. Pet. Ex. 2 at 6. Dr. Watson noted that Petitioner had done some PT and received a cortisone injection, but "things really had not progressed." *Id.* Dr. Watson noted Petitioner was a traveling nurse and had not been seen in a while but had been dealing with her shoulder "for over a year." *Id.* Petitioner reported the pain was sharp, dull, aching, and constant and again reported it began after the flu vaccinate. *Id.* On examination, Petitioner had stiffness and reduced ROM in her right shoulder. *Id.* A repeat right shoulder x-ray revealed mild thinning of the joint. *Id.* Dr Watson's assessment was right shoulder pain and chronic frozen shoulder. *Id.* at 10. He recommended manipulation of the shoulder under anesthesia ("MUA") and aggressive PT. *Id.* Petitioner reported she was living in Washington state, and the plan to arrange for her to undergo a MUA there. *Id.*

Petitioner ultimately decided not to pursue surgical intervention for her right shoulder, and has not sought additional treatment since that April 2019 visit, mainitaing it resolved that summer. Pet. Mot. at 5.

### B. Personal Statements

Petitioner has submitted six total affidavits in support of her claim – three from herself, one from her husband, one from her sister, and one from a friend. *See* Exs. 8-13. These will be discussed briefly.

Petitioner's first affidavit, executed on April 14, 2021, broadly asserts the requirements for showing entitlement in a Table SIRVA claim but does not provide any narrative on her condition. Ex. 8.

Petitioner's second affidavit, executed on June 14, 2022, begins by noting that her symptoms began on the same day she received the flu vaccination. Ex. 9 ¶ 4. She then describes how, while still treating her symptoms, she decided to change her employment and become a travel nurse, living in different cities in an RV with her husband and child. *Id.* ¶¶ 9-14. As a result of this, Petitioner asserts that she did not have health insurance from May 25, 2018, until March 2019 when she accepted a new position which provided health insurance. *Id.* ¶¶ 14-15. Finally, Petitioner notes that without health insurance, she was not in a position financially to seek treatment and was unable to establish primary care due to moving frequently. *Id.* ¶ 16.

Petitioner's third affidavit, executed on May 12, 2023, Petitioner discusses how when she was discharged from PT, although her shoulder symptoms had improved, she was still having pain, particularly when reaching back with or raising her right arm, and that she was given a HEP to help manage her continuing symptoms. Ex. 10 ¶ 7. Petitioner describes how these symptoms continued to affect her during the period when she was uninsured and not actively seeking treatment – during a trip to Japan in June 2018 she had difficulty utilizing the airplane overhead luggage storage, and while living in her RV, much of the storage was overhead and she could not reach with her right arm to access these areas and would have to climb onto the counter top for access. *Id.* ¶¶ 12-13. Petitioner notes that the medical treatment she did receive between May 16, 2018, and April 18, 2019, when she was uninsured, was related to a prior instance of ovarian cancer, and that although she was cancer-free by May 2018, she was still required for follow-up scans, lab work, and physical examinations. *Id.* ¶ 16. Finally, Petitioner states that when she eventually resumed treatment of her shoulder in April 2019, she was recommended surgery but opted not to pursue that course because her right shoulder symptoms had, in large part, resolved by the summer of 2019. *Id.* ¶ 18.

The next affidavit is from Petitioner's husband, Mr. Steven Standefer, was executed on May 11, 2023. Ex. 11. Mr. Standefer states that he remembers Petitioner complaining of tinging in her right shoulder the night of receiving a flu vaccination, and that her condition worsened in the following days to where she had difficulty moving her arm and lifting objects. *Id.* ¶ 5. He further states that when they were living in an RV, he noticed Petitioner had difficulty reaching into upper sections of the RV and could not assist with moving boxes in or out of it. *Id.* ¶¶ 6-7. Mr. Standefer finally recounts that although some days were better than others, Petitioner did not experience lasting relief of her symptoms until the summer of 2019. *Id.* ¶ 9.

The affidavit from Petitioner's sister, Ms. Lisa Honn, was executed on May 12, 2023. Ex. 12. Ms. Honn recounts traveling with Petitioner to Japan in May and June of 2018, and that she observed Petitioner having problems with certain activities utilizing her right shoulder, such as moving luggage. *Id.* ¶ 5. She also recalls talking to Petitioner on the phone during the time she was working as a travel nurse and discussed the issues Petitioner was having living in an RV due to her right shoulder. *Id.* ¶ 6. Finally, Ms. Honn notes that she saw Petitioner around Christmas in 2018 and that she observed that her right shoulder was still bothering her. *Id.* ¶ 7.

The final affidavit is from Ms. Christine Taylor, a friend of Petitioner. Ex. 13. Ms. Taylor states that she lived near Petitioner and that in late 2018 and early 2019, she saw and talked to Petitioner frequently and that she recalls Petitioner mentioning her right shoulder pain during this time at least once. *Id.* ¶ 4.

## III. Parties' Respective Arguments

Respondent argues that Petitioner has failed to meet the severity requirement because the records do not support the contention that she suffered the effects of her SIRVA for at least six months. Report at 5-6. Petitioner maintains that the record is sufficient to establish preponderant evidence in her favor. Mot. at 6.

## IV. Applicable Law

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did

not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs*., 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V. Analysis

### I. Fact Findings – Onset and Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that they suffered an injury meeting the Table criteria, in which

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for his injury. *See* § 11(c)(1)(A)(B)(D)(E).

case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence supports the conclusion that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

#### 1. Petitioner has no Prior Right Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Here, there is no evidence that Petitioner suffered from right shoulder pain before her January 29, 2018 vaccination. Respondent

has also not made any argument suggesting he believes that Petitioner had a prior right shoulder condition or injury. Accordingly, Petitioner has met the first QAI requirement.

### 2. Pain Occurs Within the Specified Timeframe (Onset)

A petitioner must show that they experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. §§ 100.3(a)(XIV)(B) & 100.3(c)(10)(ii) (QAI criteria)). Respondent has not argued that Petitioner has failed this requirement, and upon consideration of the record I find that preponderant evidence exists to find that Petitioner's right shoulder pain likely began within 48-hours of receiving a flu vaccine on January 29, 2018.

### 3. Petitioner's Pain and Limited Range of Motion was Limited to Her Right Shoulder

The specific language of a SIRVA injury contained in the QAI of the Vaccine Injury Table is that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii) (QAI criteria)). Respondent has not offered any argument that Petitioner's pain and reduced range of motion impacted anywhere other than her right shoulder, and there is nothing in the record which would allow me to make such a finding. Accordingly, Petitioner has satisfied the third QAI requirement for entitlement.

### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain Petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Once again, there is insufficient evidence in the record to suggest an alternative cause of Petitioner's right shoulder issues and Respondent does not argue that there is any evidence of another condition or abnormality. There is no serious contention that Petitioner's initial symptoms were brought on by anything other than her vaccination. Accordingly, I find that Petitioner has satisfied the fourth QAI requirement for entitlement.

## B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly on January 29, 2018. Ex. 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Petition at 4; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's right shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). I have also found that Petitioner's pain and reduced range of motion was limited to her right shoulder. 42 C.F.R. § 100.3(c)(10). Finally, I find that there was no condition or abnormality that would explain Petitioner's symptoms after vaccination. *Id*. Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of her injury-associated symptoms. For compensation to be awarded, the Vaccine Act requires that a petitioner suffered the residual effects of their shoulder injury for more than six months (or required surgical intervention). *See* Section 11(c)(1)(D)(i) (statutory six-month requirement).

To satisfy the six-month requirement, "[a] potential petitioner must do something more than merely submit a petition and an affidavit parroting the words of the statute." *Faup v. Sec'y of Health & Hum. Servs.,* No. 12-87V, 2015 WL 443802, at *4 (Fed. Cl. Spec. Mstr. Jan. 13, 2015). Rather, a petitioner is required to "submit supporting documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months[.]" *Id.* Although a petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion, the fact that a claimant has been discharged from medical care before the expiration of the six-month period does not necessarily establish that there are no remaining or residual effects from his or her alleged injury. *See, e.g.*, *Herren v. Sec'y of Health & Hum. Servs.,* 2014 WL 3889070, at *3 (finding that a petitioner suffered from residual symptoms that due to their mild nature did not require medical care).

It is uncontroverted that Petitioner received a flu vaccine on January 29, 2018. Therefore, to meet the severity requirement she must show that her symptoms persisted through at least July 29, 2018. Respondent notes that Petitioner stopped seeking treatment after May 16, 2018, just short of five months post-vaccination, and that she did not seek treatment for her right shoulder until nearly a year later, despite having several

medical appointments in the interim. Report at 6. Thus, Respondent deems severity to be unmet. Respondent also argues that the affidavits submitted by Petitioner, particularly those from her husband, sister, and friend, do not materially support her claim because they were created over five years after vaccination and for the purposes of litigation. Response at 2.

Based on my review of the totality of the record, preponderant evidence exists to find that Petitioner has established the severity of her injury (although the treatment gap in this case is quite large, and was reasonably called into question by Respondent). When Petitioner was discharged from PT on May 16, 2018, a HEP was proposed despite her demonstrated improvement – thus suggesting that her symptoms had not completely abated at that time. Ex. 3 at 10. And it appears Petitioner pursued such conservative, self-care in the intervening timeframe. Moreover, Petitioner's affidavits have provided a compelling narrative as to why she would choose to cease formal treatment of her injury despite lingering issues – she accepted a new job which created a more itinerant lifestyle, and did not have health insurance. It is not unreasonable that Petitioner would decide only to incur medical costs during this period for her most serious health concerns, such as follow-up treatment to monitor her cancer's remission.

Thus, the evidence in the record allows me to find that Petitioner's symptoms more likely than not continued to persist for at least one more month, which would satisfy the severity requirement. However, I note that despite a finding of entitlement, the record reflects an *exceedingly* mild SIRVA which did not require surgery, was managed well enough through PT and a HEP for a lengthy period of time, and which required almost no treatment even after the gap. Any damages that may be awarded in this case will take these factors into account (and will almost surely result in a minimal pain and suffering award).

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements fo

r compensation. I therefore find that Petitioner is entitled to compensation in this case.

## Conclusion

**In view of the evidence of record, I find Petitioner is entitled to compensation. A damages order will be entered following the issuance of this ruling to direct the parties of the next steps in resolving damages.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master